Timothy B. Smith (USB #8271)
Benjamin D. Perkins (USB #18503)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone: 801.532.1234
Facsimile: 801.536.6111
TBSmith@parsonsbehle.com
BPerkins@parsonsbehle.com

*Attorneys for Richard Gaetano and Karen Domingo*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| CELTIC BANK CORPORATION, a Utah corporation,<br><br>      Plaintiff,<br><br>vs.<br><br>RICHARD GAETANO, an individual, KAREN DOMINGO, an individual, MCKENZIE JOHNSON, an individual, and DOES 1-10,<br><br>      Defendants. | **ANSWER AND COUNTERCLAIM OF RICHARD GAETANO AND KAREN DOMINGO**<br><br>Civil No. 2:24-cv-00146<br><br>Judge: Hon. Howard C. Nielson, Jr.<br><br>Magistrate Judge: Hon. Cecilia M. Romero<br><br>**Jury Trial Demanded** |
| RICHARD GAETANO, an individual, KAREN DOMINGO, an individual,<br><br>      Counterclaimants,<br><br>vs.<br><br>CELTIC BANK CORPORATION, a Utah corporation,<br><br>      Counterclaim Defendant. | |

4887-8790-8020.v2

Defendants and Counterclaimants Richard Gaetano and Karen Domingo respectfully submit their Answer and Counterclaim in response to Celtic Bank Corporation's ("Celtic") Complaint.

## NATURE OF THE CASE

1.      Celtic brings this action to protect its confidential information, client and customer files, trade secrets, goodwill, business interests, and other valuable property from unlawful use and further misappropriation by Defendants and to recover all such property from Defendants.

RESPONSE:  Defendants admit that Celtic's Complaint contains claims for, among other things, misappropriation of trade secrets, breach of fiduciary duty, and conversion. Defendants deny the remaining allegations in this paragraph of the Complaint.

2.      Defendants' unlawful actions as pleaded below have caused and will continue to cause Celtic (and its customers and clients) irreparable harm if they are not enjoined from misusing for the benefit of themselves and others and from the continued refusal to return the Company's confidential information, client and customer files, trade secrets, and other valuable property and directed to return all such property immediately.

RESPONSE:  Denied.

## PARTIES

3.      Plaintiff Celtic Bank is a Utah banking corporation having its principal place of business in Salt Lake City, Utah. Celtic provides financing for small businesses and has ranked in the top ten SBA lenders nationally every year since 2013.

RESPONSE:  Defendants admit Celtic is a bank with its principal place of business in Salt Lake City, Utah that provides loans to small businesses. Defendants lack sufficient information to admit or deny the remaining allegations in this paragraph of the Complaint, and therefore deny the same.

2

4.      Defendant Richard Gaetano is an individual, formerly employed by Celtic, who on information and belief resides in Palm Beach Gardens, Florida.

RESPONSE:  Admitted.

5.      Defendant Karen Domingo is an individual, formerly employed by Celtic, who on information and belief resides in Salt Lake City, Utah.

RESPONSE: Admitted.

6.      Defendant McKenzie Johnson is an individual, formerly employed by Celtic, who on information and belief resides in Nashville, Tennessee.

RESPONSE:  Defendants admit Johnson was employed by Celtic. Defendants lack sufficient information to admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

7.      DOES 1-10 are defendant individuals and/or entities whose true names are unknown, but who were involved in the conduct described herein and are liable for the claims for relief detailed herein.

RESPONSE:  Defendants lack sufficient information to admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

**JURISDICTION AND VENUE**

8.      This Court has federal question jurisdiction pursuant to 28 U.S.C.A. § 1331, under the Defend Trade Secrets Act of 2016, 18 U.S.C.A. §§ 1832-1839 ("DTSA") and Civil Racketeer Influenced and Corrupt Organizations, 18 U.S.C.A. § 1962 ("RICO").

RESPONSE:  Admitted.

9.      This Court has supplemental jurisdiction over Plaintiffs remaining claims pursuant to 28 U.S.C.A. § 1367.

RESPONSE:  Admitted.

10.     The Court has personal jurisdiction over Defendants, as they were each employed by a Utah company and entered employment-related agreements in Utah.

RESPONSE:  Defendants admit they were employed by Celtic. Defendants deny they had any "employment-related agreements" with Celtic. Defendants admit this Court has personal jurisdiction over them.

11.     Venue in this Court is proper under 28 U.S.C.A. § 1391(b) because a substantial part of the acts or omissions giving rise to the claims alleged herein occurred within this judicial district, and Defendants are subject to personal jurisdiction here.

RESPONSE:  Defendants admit venue is appropriate in this Court. Defendants deny any implication that "the acts or omissions" they are accused of give rise to any legitimate claims.

## FACTS

### A.    *General Business Background of Celtic*

11.     Celtic's essential focus is SBA lending, and as a top ten SBA lender nationally since 2013, has funded over four billion dollars ($4 Billion) to more than ten thousand (10,000) small businesses.

RESPONSE:  Defendants lack sufficient information to admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

12.     Since its founding in 2001, Celtic has helped business owners with working capital, expansion, acquisition, construction, equipment financing, real estate purchases, and refinances, and provides a full range of equipment financing and leasing, commercial solar financing, asset-based lending, and other offerings.

RESPONSE:  Defendants lack sufficient information to admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

4

13.     To build up and maintain its large network of customers, Celtic has spent hundreds of thousands of dollars on advertising, trainings, and networking to attract small business customers and to provide top-notch services.

RESPONSE:  Defendants lack sufficient information to admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

14.     Celtic has also devoted much time and expense over the years to developing trade secrets, including its proprietary and confidential technical information, methods, techniques, processes, procedures, and bank forms used for underwriting and closing SBA loans.

RESPONSE:  Defendants lack sufficient information to admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

15.     As a result of Celtic's substantial investment of time, money, and effort, it grew a thriving banking business built on the vast network of relationships it developed and maintained with its customers, and earned its reputation as a top ten SBA lender nationally.

RESPONSE:  Defendants lack sufficient information to admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

**B.     *Defendants ' Employment with Celtic.***

16.     Celtic employed Mr. Gaetano from 2014 through his voluntary resignation, effective February 7, 2024, as the Senior Vice President of Business Development.

RESPONSE:  Gaetano admits that he worked for Celtic from 2014 until February 7, 2024 as a Senior Vice President of Business Development. Gaetano denies his resignation was "voluntary," as Celtic pushed him out of its business by allowing its employees to create a hostile and intolerable working environment.

17.     Mr. Gaetano was hired to find qualified applicants and assist them in applying for SBA and USDA loan transactions. As part of his employment, Mr. Gaetano had access to customer

files, broker files, and all aspects of Celtic's loan processes. Specifically, he was to develop and cultivate relationships with customers and brokers to generate business leads with small business owner borrowers, develop marketing strategies in collaboration with Celtic's Chief Business Development Officer and Marketing team, use Celtic's processes and methods to submit loan packages to Celtic's underwriting team, and propose lending transactions to Celtic's Credit Committee. These duties required extensive knowledge of Celtic's operational processes, methods, techniques, and formulae and resulted in a high level of trust being placed in Mr. Gaetano.

RESPONSE:  Gaetano admits this paragraph of the Complaint, except for the portion of the paragraph that states "all aspects of Celtic's loan processes." This phrase is not sufficiently clear to allow Gaetano to admit or deny it. To the extent a response to this unclear phrase is required, Gaetano denies he had access to "all aspects of Celtic's loan processes."  Gaetano denies any implication he has knowledge of Celtic's processes that are unrelated to his former role at Celtic.

18.     Celtic employed Ms. Domingo from 2014 through her voluntary resignation, effective February 7, 2024, as Assistant Vice President of Business Development/Business Development Associate.

RESPONSE:  Admitted.

19.     Up until the date of her resignation, Ms. Domingo worked on Mr. Gaetano's SBA loan team as a Business Development Associate, and Mr. Gaetano was her direct supervisor.

RESPONSE:  Admitted.

20.     Ms. Domingo's job duties included supporting Mr. Gaetano in his efforts to locate small business owners and introducing them to Celtic and preparing and organizing customer files

used in the loan application process, some of which contained sensitive personal identifiable information ("PII") and other confidential business information. These duties required extensive knowledge of Celtic's operational processes, methods, techniques, and formulae and resulted in a high level of trust being placed in Ms. Domingo.

RESPONSE:  Domingo admits this paragraph of the Complaint, except for the portion of the paragraph that states "some of which contained sensitive personal identifiable information ("PII") and other confidential business information." This paragraph does not define "personal identifiable information," and accordingly, Domingo cannot admit or deny that the customer files contained "personal identifiable information." To the extent that a response is required, Domingo admits some of the information in the customer files would allow a person to identify the customer associated with the files. This paragraph also does not define "confidential business information," and accordingly, Domingo cannot admit or deny that the customer files contained "confidential business information." To the extent a response is required, Domingo admits that some of the customer files contain information related to Celtic's business. Domingo denies any implication that she has knowledge of Celtic's processes that are unrelated to her former role at Celtic.

21.     Celtic employed Ms. Johnson from 2021 through her voluntary resignation, effective February 6, 2024, as Business Development Associate.

RESPONSE:  Admitted.

22.     Up until the date of her resignation, Ms. Johnson worked on Mr. Gaetano's SBA loan team, and Mr. Gaetano was her direct supervisor.

RESPONSE:  Admitted.

23.     Ms. Johnson's job duties included preparing and organizing customer files used in the loan application process, some of which contained sensitive PII and other confidential business

information as well as having direct access to Celtic's contact management system where she was tasked with tracking incoming sales leads and potential opportunities, and keeping sales accounts up to date and accurate. These duties required extensive knowledge of Celtic's operational processes, methods, techniques, and formulae and resulted in a high level of trust being placed in Ms. Johnson.

RESPONSE:  Defendants deny that Johnson "was tasked with tracking incoming sales leads and potential opportunities" and deny that Johnson was tasked with "keeping sales accounts up to date and accurate." Additionally, this paragraph does not define "personal identifiable information," and accordingly, Defendants cannot admit or deny that the customer files contained "personal identifiable information." To the extent that a response is required, Defendants admit some of the information in the customer files would allow a person to identify the customer associated with the files. This paragraph also does not define "confidential business information," and accordingly, Defendants cannot admit or deny that the customer files contained "confidential business information." To the extent a response is required, Defendants admit that some of the customer files contain information related to Celtic's business. Defendants admit the remaining allegations in this paragraph of the Complaint. Defendants deny any implication that Johnson has knowledge of Celtic's processes that are unrelated to her former role at Celtic.

C.     **The Defendants' Employment Agreements with Celtic Protect Celtic's Legitimate Business Interests, Confidential Information, and Trade Secrets.**

21.     Mr. Gaetano, Ms. Domingo, and Ms. Johnson each executed numerous employment agreements with Celtic, both at the time they were hired and at other times during the course of their employment.

RESPONSE:  Denied.

22.     Under their respective agreements, Mr. Gaetano, Ms. Domingo, and Ms. Johnson each acknowledged and agreed to the following:

a.      to refrain from any potential or real conflict of interest, and to avoid even the appearance of a conflict of interest, which required refraining from any activities that compete with Celtic, outside activities that negatively impact Celtic, using Celtic facilities, equipment, or supplies for personal benefit, and diverting business opportunities for personal gain;

b.      that, in their capacities as employees, they may be given access to certain confidential information and trade secrets belonging to Celtic;

c.      that they were not entitled to "unlimited access of information," and a "legitimate business purpose must exist for any access to any information in any form";

d.      that they were restricted from disclosing such confidential information; and

e.      that they had mandatory obligations to report any conflicts of interest, any violations of Celtic's policies, and other misconduct.

RESPONSE:  Denied.

23.     During the course of their employment, the Former Employees were given access to certain confidential information and trade secrets belonging to Celtic.

RESPONSE:  Defendants admit they were given access to information related to Celtic's business. Defendants lack sufficient information to admit or deny that the information they were given access to is confidential or constitutes trade secrets, and therefore deny the same. Defendants affirmatively allege that at least some, and possibly all, of the information they received access to was not confidential and did not constitute trade secrets.

24.     Celtic's confidential information to which the Former Employees had access qualifies as trade secrets under the Defend Trade Secrets Act, 18 U.S.C. § 1836 et seq. Celtic's

trade secrets include virtually every piece of knowledge that a competitor of Celtic would want to know about Celtic's business operations, including, without limitation, its client and customer lists, business plans, marketing strategies, training materials, bank forms and templates used in underwriting and closing loans, proprietary formulae for testing lending opportunities, and proprietary methods and processes.

RESPONSE:  Defendants admit they were given access to information related to Celtic's business. Defendants lack sufficient information to admit or deny the remaining allegations in this paragraph of the Complaint, and therefore deny the same. Defendants affirmatively allege that at least some, and possibly all, of the information they received access to was not confidential and did not constitute trade secrets.

25.     In addition, some of Celtic's confidential information to which the Former Employees had access constitutes or otherwise contains PII of its clients and customers, such as social security numbers, financial account information, tax returns and taxpayer identification numbers, personal addresses and other contact information, and other identifying information sufficient to link a person or entity to a financial account, the disclosure of which is strictly prohibited by banking regulations.

RESPONSE:  Defendants admits that some of the information they had access to contains social security numbers, financial account information, tax returns and taxpayer identification numbers, personal addresses and other contact information, and other identifying information sufficient to link a person or entity to a financial account. Defendants deny that "banking regulations" do not allow for disclosure of this information.

26.     Each of the Former Employees' agreements with Celtic are defined more fully below:

RESPONSE:  Defendants deny they had any agreements with Celtic.

i.      *Security Agreement (Between Celtic and All Former Employees)*

27.     As a condition of their employment, at the time each of the Defendants were hired, or shortly thereafter, Mr. Gaetano, Ms. Domingo, and Ms. Johnson were each required to execute the Information Security Confidentiality and Security Procedures Agreement ("Security Agreement").

RESPONSE:  Defendants admit that they signed a document titled "Information Security Confidentiality and Security Procedures Agreement" during their employment with Celtic. As at-will employees, Defendants admit that Celtic may have terminated their employment had they not signed the document, or for other reasons. Defendants deny any implication that the document contained a promise of continued employment or constitutes a contract.

28.     Mr. Gaetano executed the Security Agreement on May 22, 2014, Ms. Domingo executed the Security Agreement on November 24, 2014, and Ms. Johnson executed the Security Agreement on August 19, 2021. Combined copies of each of their fully executed Security Agreements are attached hereto as Exhibit "A."

RESPONSE:   Gaetano admits he signed a document titled "Information Security Confidentiality and Security Procedures Agreement" on May 22, 2014, which is attached to the Complaint. Domingo admits she signed a document titled "Information Security Confidentiality and Security Procedures Agreement" on November 24, 2014, which is attached to the Complaint. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph and therefore deny the same.

29.     Pursuant to the Security Agreement, each of the Former Employees was made aware that they would "be involved with the handling and the processing of confidential

information" and that such information "may be either written, verbal or that which is obtained through the utilization of our computer network."

    RESPONSE:  Defendants admit that the document titled "Information Security Confidentiality and Security Procedures Agreement" contains the language quoted in this paragraph of the Complaint.

    30.    Further, the Security Agreement states that "all information relating to the Bank and its customers [must] remain strictly confidential. Discussions about the Bank and/or its customers are to be restricted to personnel within the Bank who have a professional need to know."

    RESPONSE:   Defendants admit that the document titled "Information Security Confidentiality and Security Procedures Agreement" contains the language quoted in this paragraph of the Complaint, other than the word "must."

    31.    Moreover, the Security Agreement provides:

> You may be given special codes or authorizations to access confidential information. These codes or authorizations should not be shared with anyone whether inside or outside of the Bank. If anyone asks you for this information you should contact your supervisor and they will determine if the Systems Administrator should be alerted. You are responsible for any access violations which may occur with special identifications assigned to you.
>
> Your code and/or authorization do not entitle you to unlimited access of information. A legitimate purpose must exist for any access to information in any form.
>
> . . .
>
> Your security responsibility not only includes the policies stated above but also extends to all other security policies.

(emphasis added).

RESPONSE:   Defendants admit that the document titled "Information Security Confidentiality and Security Procedures Agreement" contains the language quoted in this paragraph of the Complaint.

32.     Each of the Former Employees confirmed that they "read and completely understand this agreement and will abide by all parts of this agreement and any additional security requirements of which [they] may be informed from time to time" by signing the Security Agreement.

RESPONSE:   Defendants admit that the document titled "Information Security Confidentiality and Security Procedures Agreement" contains the language quoted in this paragraph of the Complaint.

### ii.       *Ethics Agreement (Between Celtic and All Former Employees)*

33.     As a condition of their employment, the Former Employees were each required, annually, to review Celtic's Code of Ethics and to execute an Acknowledgment and Attestation of Celtic Bank's Code of Ethics, which stated: "As a current employee/director of Celtic Bank, I acknowledge I have completed the Code of Ethics training, understand the contents and attest I will adhere to the requirements of the Bank's Code of Ethics."

RESPONSE:  Defendants admit that Celtic required them to annually review a "Code of Ethics Policy" and to execute an "Acknowledgement and Attestation of Celtic Bank's Code of Ethics," which contains the language quoted in this paragraph of the Complaint. As at-will employees, Defendants admit that Celtic may have terminated their employment had they not executed an Acknowledgment and Attestation of Celtic Bank's Code of Ethics, or for other reasons. Defendants deny that the "Code of Ethics Policy" contains a promise of continued employment or constitutes a contract.

34.     After agreeing to the Acknowledgement and Attestation, the Former Employees were issued a Certification, confirming that they have fully executed the Code of Ethics Agreement by reviewing Celtic's Code of Ethics and agreeing to adhere to its requirements.

RESPONSE:  Defendants admit that after executing the Acknowledgement and Attestation of Celtic Bank's Code of Ethics, they received certain certifications, which were awarded "for successfully completing the course Celtic Bank Code of Ethics." Defendants deny the remaining allegations in this paragraph of the Complaint.

35.     The Code of Ethics document, Acknowledgment and Attestation of Celtic Bank's Code of Ethics, and Certification, together, constitute a valid contract between each of the Former Employees and Celtic (the "Ethics Agreement"). The Former Employees were each required to execute an Ethics Agreement annually. Mr. Gaetano most recently executed an Ethics Agreement on December 29, 2023, Ms. Domingo most recently executed an Ethics Agreement on December 30, 2023, and Ms. Johnson most recently executed an Ethics Agreement on November 29, 2023. Combined copies of each of their fully executed Ethics Agreements are attached hereto as Exhibit "B."

RESPONSE:  Gaetano admits that he received a certification "for successfully completing the course Celtic Bank Code of Ethics" on December 29, 2023. Domingo admits that she received a certification "for successfully completing the course Celtic Bank Code of Ethics" on December 30, 2023. Defendants lack sufficient information to admit or deny that Johnson "executed an Ethics Agreement on November 29, 2023," and therefore deny the same. Defendants deny they have an ethics agreement, or any agreement, with Celtic. Defendants deny the remaining allegations in this paragraph of the Complaint.

36.     Pursuant to the Ethics Agreements, the Former Employees were prohibited from engaging in: (1) "activities that compete with the Bank"; and (2) "activities that compromise the Bank's interests." Additionally, pursuant to the Ethics Agreement, "No employee or Director should take for his or her own benefit any opportunity discovered in the course of employment that the employee or Director has reason to know would benefit the Bank."

RESPONSE:  Defendants admit that the "Code of Ethics Policy" states "Employees may not engage in activities that compete with the Bank" and "Employees and Directors may not engage in activities which compromise the Bank's interests," along with the other quoted language contained in this paragraph of the Complaint.

37.     The Ethics Agreement mandates that the Former Employees "must avoid any potential conflict or appearance of compromise that might arise because of economic or personal self-interest."

RESPONSE:  Defendants admit that the "Code of Ethics Policy" contains the language quoted in this paragraph of the Complaint.

38.     The Ethics Agreement provides a non-exhaustive list defining activities that constitute a conflict of interest, including, but not limited to, the following:

- Outside activities which negatively impact the Bank. An employee's outside business activities compete or potentially could compete with the Bank or such activities could damage or impede Bank business.

- Inappropriate use of Bank connections. An employee's business interests might benefit because of access to Bank information or through credibility associated with employment at the Bank.

- Use of Bank facilities, equipment, or supplies for personal activities. An employee uses Bank equipment, supplies, or facilities for his/her personal benefit or for the benefit of an outside corporation without appropriate Management approval.

- • Diversion of business opportunities for personal gain. An employee diverts for personal gain, any business opportunity from which the Bank may profit.

- • Developing inappropriate relationships. Developing a relationship with a customer or other business contact which may jeopardize an employee's independent judgment.

RESPONSE:  Defendants admit that the "Code of Ethics Policy" contains the language quoted in this paragraph of the Complaint.

39.    Moreover, the Ethics Agreement requires mandatory reporting of any knowledge of any employee's conflict of interest, any material transaction or relationship that could give rise to conflict of interest, and any good faith belief that someone has violated the Code of Ethics. Specifically, the Ethics Agreement states:

> If an employee or Director becomes aware of a conflict of interest, of any material transaction or relationship that reasonably could be expected to give rise to a conflict of interest, or has a question as to a potential conflict of interest, the employee or Director must consult with the Chairman of the Audit Committee, or his designee. If an employee or Director becomes involved in a situation that gives rise to an actual conflict of interest, the employee or Director must inform the Chair of the Audit Committee, or his designee.

(emphasis added). Further, the Ethics Agreement states:

> Any employee or Director who in good faith believes or suspects that any portion of this Code has been violated . . . and does not feel comfortable addressing the issue with individuals identified above should immediately report such violation to the chairman Audit Committee, or their designee. Any such report will be promptly evaluated and/or investigated. Any person reporting such a violation should be prepared to provide the details about the suspected violation, including the individuals involved, the nature of the violation, documentation of the violation, or any other information which may be helpful in the Bank's evaluation and, if necessary, investigation of the complaint.

> Prompt disclosure to the appropriate parties is vital to ensuring a thorough and timely evaluation and appropriate resolution. A violation of this Code is a serious matter and could have legal implications.

(emphasis added).

<u>RESPONSE</u>:  Defendants admit that the "Code of Ethics Policy" contains the language quoted in this paragraph of the Complaint.

40.     Pursuant to the Code of Ethics, in addition to having personal liability for one's own misconduct and violations of the Ethics Agreement, an employee's supervisor is also liable for an employee's misconduct and violations of the Ethics Agreement if the supervisor "directs or approves such employee's improper actions, or is aware of those actions but does not act appropriately to correct them."

<u>RESPONSE</u>:  Defendants admit that the "Code of Ethics Policy" states "the Bank may also impose discipline, as appropriate, upon an employee's supervisor, if any, who directs or approves such employee's improper actions, or is aware of those actions but does not act appropriately to correct them."

41.     The Ethics Agreement also contains a provision related to Celtic's intellectual property ("IP") rights, and states: "As a condition of employment, the Bank retains exclusive ownership of such inventions, improvements, software, technology, hardware, branding, and other work created during employment or which arises during the course of employment."

<u>RESPONSE</u>:  Defendants admit that the "Code of Ethics Policy" contains the language quoted in this paragraph of the Complaint.

*iii.    **Privacy Agreement (Between Celtic and Mr. Gaetano and Ms. Domingo)***

42.     As a condition of their employment, at the time Mr. Gaetano and Ms. Domingo were hired, or shortly thereafter, Mr. Gaetano and Ms. Domingo were each required to review Celtic's Privacy Policy and execute the Acknowledgement of Reading Privacy Policy ("Privacy Agreement"), in which Mr. Gaetano and Ms. Domingo each agreed, "I have read the Privacy Policy of Celtic Bank Corporation, understand the contents, and will adhere to its requirements."

RESPONSE:  Defendants admit that they read a document titled "Celtic Bank Privacy Policy" and signed a document titled "Acknowledgement of Reading Privacy Policy" during their employment with Celtic. Defendants admit that the "Acknowledgement of Reading Privacy Policy" contains the language quoted in this paragraph of the Complaint. As at-will employees, Defendants admit that Celtic may have terminated their employment had they not signed the document, or for other reasons. Defendants deny any implication that the Celtic Bank Privacy Policy contained a promise of continued employment or constitutes a contract.

43.    Mr. Gaetano executed the Privacy Agreement on May 22, 2014, and Ms. Domingo executed the Privacy Agreement on November 24, 2014. Combined copies of each of their fully executed Privacy Agreements are attached hereto as Exhibit "C."

RESPONSE: Gaetano admits he signed a document titled "Acknowledgement of Reading Privacy Policy" on May 22, 2014, which is attached to the Complaint. Domingo admits she signed a document titled "Acknowledgement of Reading Privacy Policy" on November 24, 2014, which is attached to the Complaint.

44.    Pursuant to the Privacy Agreement, Celtic and its employees must "not disclose nonpublic personal information of either current or former customers, except for disclosures that are exempt by sections 14 and 15, or when required or allowed by law."

RESPONSE:  Defendants admit that the Celtic Bank Privacy Policy contains the language quoted in this paragraph of the Complaint.

45.    Additionally, the Privacy Agreement requires that "[a]ll personal information collected and stored by the Bank is used for specific business purposes to protect and administer accounts and transactions, and to comply with state and federal banking regulations." To this end, the Privacy Agreement states that Celtic "limits employee access to customer information to only

those employees with a business reason for knowing such information." In addition, "individual user names and passwords are used by approved bank personnel to access customer information, along with providing audit trails to further safeguard the privacy of customer information."

RESPONSE:  Defendants admit that the Celtic Bank Privacy Policy contains the language quoted in this paragraph of the Complaint.

### iv.  *Confidential Information Agreement (Between Celtic and Ms. Johnson)*

46.    As a condition of her employment, at the time Ms. Johnson was hired, or shortly thereafter, Ms. Johnson was required to review Celtic's Confidential Information Policy and execute the Acknowledgement of Receipt and Review ("Confidential Information Agreement"), in which Ms. Johnson agreed, "I received a copy of Celtic Bank's Confidential Information Policy and that I read it, understood it and agree to comply with it."

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

47.    Ms. Johnson executed the Confidential Information Agreement on August 19, 2021. A copy of Ms. Johnson's fully executed Confidential Information Agreement is attached hereto as Exhibit "D."

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

48.    Pursuant to the Confidential Information Policy, which is incorporated by reference in the Confidential Information Agreement, Celtic "keeps certain types of information confidential for important business reasons, some of which include obligations under banking regulations and providing Celtic Bank with a competitive edge over competitors."

<u>RESPONSE</u>:   Defendants admit that the document titled "Confidential Information Policy," which is attached to the Complaint, contains the language quoted in this paragraph of the Complaint.

49.   Further, the Confidential Information Policy emphasizes "the importance of maintaining the confidentiality of certain information," and states that "effective confidentiality protocols require the involvement and cooperation of Celtic Bank employees." To this end, "All employees are expected to read and abide by this policy."

<u>RESPONSE</u>:   Defendants admit that the document titled "Confidential Information Policy," which is attached to the Complaint, contains the language quoted in this paragraph of the Complaint.

50.   Celtic's Confidential Information Policy defines confidential information as:

> Confidential Information includes, but is not limited to, all information belonging to Celtic Bank and not generally known to the public or persons in the banking industry and may be in spoken, print, electronic or any other form or medium which you may encounter during your employment at Celtic Bank. Confidential Information can include information which was learned, discovered, developed, conceived, originated, or prepared by you or other employees in the scope and course of your employment, relating to: business processes, practices, methods, policies, plans, documents research, operations, services, strategies, techniques, agreements, contracts, terms of agreements, transactions, potential transactions, negotiations, pending negotiations, know-how, trade secrets, computer programs, computer software, web design, work-in-process, databases, vendor information, financial information, accounting records, legal information, marketing information, pricing information, credit information, payroll information, staffing information, employee lists, supplier lists, vendor lists, internal controls, security procedures, sales information, revenue, costs, algorithms, product plans, specifications, customer information, customer lists, client information, of Celtic Bank or its businesses or any existing or prospective customer, supplier, investor, or other associated third party, or of any other person or entity that has entrusted information to Celtic Bank in confidence.

> Confidential Information also includes other information that is marked or otherwise identified as confidential or proprietary, information that would otherwise appear to a reasonable person to be confidential or proprietary in the context and circumstances in which the information is known or used.

RESPONSE:   Defendants admit that the document titled "Confidential Information Policy," which is attached to the Complaint, contains the language quoted in this paragraph of the Complaint.

51.     Additionally, the Confidential Information Policy limits disclosure of its Confidential Information to: "Employees with a need to know to perform their jobs and third parties requiring the information for a legitimate business purpose, including: prospective suppliers, vendors, and customers; and individuals and companies contemplating a joint venture or other business relationship with Celtic Bank."

RESPONSE:   Defendants admit that the document titled "Confidential Information Policy," which is attached to the Complaint, contains the language quoted in this paragraph of the Complaint.

52.     The Confidential Information Agreement requires Ms. Johnson to "treat all Confidential Information as strictly confidential both during employment and after employment with Celtic Bank ends," and "return any Confidential Information in the employee's possession to Celtic Bank on termination of employment with Celtic Bank."

RESPONSE:   Defendants admit that the document titled "Confidential Information Policy," which is attached to the Complaint, contains the language quoted in this paragraph of the Complaint.

**D.     *Celtic's Customer Folders, Database, Other Confidential Information and Trade Secrets, and the Measures Celtic Implemented to Protect its Confidential Information and Trade Secrets.***

53.     Celtic stores some of its confidential information and trade secrets on password-protected OneDrive accounts. Typically, Business Development Officers and Business Development Associates will create a file for each potential loan opportunity. Among other things, OneDrive accounts often contain documents that include PII provided by potential and existing customers who were either hoping to secure, or already secured SBA loans through the efforts of Celtic (the "Customer Folders").

RESPONSE:  Defendants admit that, while employed by Celtic, they stored certain information on password-protected OneDrive accounts and created files for potential loan opportunities. Defendants further admit that some of the information included in the OneDrive accounts was related to potential and existing customers. This paragraph does not define "PII" or "personal identifiable information," and accordingly, Defendants cannot admit or deny that the OneDrive accounts contained "PII." To the extent that a response is required, Defendants admit some of the information in the OneDrive accounts would allow a person to identify the customer associated with the files. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

54.     After contact is made between customers and Celtic, and after Celtic receives the customers' loan applications and supporting documentation, Celtic evaluates whether the customers will qualify for SBA loans. This evaluation includes the use of Excel spreadsheets and other tools that contain formulae and other analysis metrics developed by Celtic to determine whether an application can proceed to formal underwriting.

RESPONSE:  Defendants admit that after they received customers' loan applications and supporting documents, they would evaluate whether the customers qualified for an SBA loan.

22

Domingo would make this evaluation using Excel spreadsheets and other tools she developed and improved. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

55.     Other confidential information is stored in Celtic's contact management system - SalesForce. Celtic's instance of SalesForce has been highly modified and represents a large investment by Celtic in creating a tracking system for loan applications progressed to final funding.

RESPONSE:  Defendants admit that information is contained in SalesForce. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

56.     Celtic invests substantial time and resources into these screening and review processes. Celtic pays its employees to spend multiple hours each day on these tasks.

RESPONSE:  Defendants admit they spent many hours curating and reviewing loan applications. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

57.     These applications, and the related needs and process lists, are Celtic's intellectual property. Celtic keeps them on password-protected OneDrive accounts, and does not disclose or share any of the related information externally.

RESPONSE:  Defendants deny that the loan application their customers filled out is confidential. The phrase "related needs and process lists" is subject to multiple interpretations and is not sufficiently clear for Defendants to either admit or deny allegations related to this phrase. To the extent a response is required, Defendants deny that "the related needs and process lists" are intellectual property. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

58.     The Celtic logo on the application documents and forms indicates that Celtic has established a relationship with the customer, and all parties involved understand and agree that Celtic will be compensated for the processes involved with securing SBA loans on behalf of its customers.

RESPONSE:   Defendants deny that Celtic's logo shows it has a relationship with prospective or actual customers. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

59.     In addition to Celtic's Customer Folders, Celtic has over the course of many years created proprietary, complex, and valuable Excel spreadsheets containing formulae for "quick testing" lending opportunities (the "Quick Test Spreadsheets"). Celtic frequently uses the Quick Test Spreadsheets to gain competitive advantages in the industry by quickly analyzing several factors to establish loan agreement terms for customers and potential customers.

RESPONSE:  Defendants admit that some may find the Quick Test Spreadsheet helpful in generating loan agreement terms for customers and potential customers. Defendants deny that the Quick Test Spreadsheet gives "competitive advantages in the industry." Defendants deny the remaining allegations in this paragraph of the Complaint.

60.     Celtic has never disclosed the Quick Test Spreadsheets externally to customers or any other person or entity. Celtic maintains a copy of the Quick Test Spreadsheet in a protected OneDrive folder, which is accessible only to Celtic employees who have pre-authorized, password protected accounts.

RESPONSE:  Defendants admit that Celtic maintains a copy of the Quick Test Spreadsheet in a OneDrive folder. Defendants deny the remaining allegations in this paragraph of the Complaint.

61.     In addition, Celtic's OneDrive stores many other confidential documents related to Celtic's operations, including, but not limited to, its business plans, marketing strategies, training materials, templates used for closing loans, bank forms used to document loans, and proprietary methods and processes used in the SBA loan division.

RESPONSE:   Defendants admit that, during their employment with Celtic, Celtic's OneDrive account contained information related to its business. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

62.     Celtic's Customer Folders, Quick Test Spreadsheet, collections of information, business model, and the other confidential and proprietary information and intellectual property set forth above all constitute trade secrets, which can only be accessed and learned by working within Celtic's business.

RESPONSE:  Denied.

63.     Celtic took many steps to maintain the confidentiality of its Customer Folders, Quick Test Spreadsheets, and other trade secrets, including, but not limited to: (a) requiring employees, including Defendants, to agree to written Security Agreements, Privacy Agreements, and Confidential Information Agreements; (b) requiring employees, Defendants, to complete annual training regarding Celtic's Code of Ethics and information security policies; (c) storing its files on secure servers; (d) requiring passwords to access its files on the secure servers; (e) restricting access to sensitive information only to individuals on a need-to-know basis; and (f) storing all confidential information in a protected OneDrive folder, which is accessible only to Celtic employees who had pre-authorized, password protected accounts.

RESPONSE:  Defendants deny they had any agreements with Celtic. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

64.     Even with executed confidentiality, security, and ethics agreements in place, Celtic never did, and never would, disclose its highly confidential and valuable Customer Folders and Customer Database, Quick Test Spreadsheet, collections of information, business model, and the other confidential and proprietary information and intellectual property to any external person or entity.

RESPONSE:  Defendants deny that none of Celtic's information is made available to "any external person or entity." At least some of Celtic's information, and possibly all of it, is publicly available. Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

**E.     The Relationship Between Defendants and Ready Capital Corporation and ReadyCap Lending, LLC.**

64.     At least as early as January 11, 2024, while still employed at Celtic, Mr. Gaetano, Ms. Domingo, and Ms. Johnson surreptitiously began working with Ready Capital, a direct competitor of Celtic.

RESPONSE:  Defendants admit they communicated with Ready Capital in January 2024 while they were still employed by Celtic. Defendants admit that Celtic contends Ready Capital is a competitor. Defendants deny they "surreptitiously began working with" Ready Capital in January 2024.

65.     Ready Capital Corporation ("Ready Capital") offers SBA loans to small businesses through a wholly-owned subsidiary, ReadyCap Lending, LLC ("ReadyCap"). ReadyCap is one of only 14 non-bank Small Business Lending Companies ("SBLC") in the United States. ReadyCap

is one of a handful of non-banks that has been granted "preferred lender status" by the SBA. In sum, ReadyCap and Ready Capital are direct, meaningful competitors to Celtic.

RESPONSE:  Defendants admit Ready Capital offers SBA loans to small businesses through ReadyCap. Defendants also admit that Celtic contends ReadyCap and Ready Capital are its competitors. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

66.     The Defendants conspired to steal Celtic's business for Ready Capital and ReadyCap before handing in their resignations at Celtic.

RESPONSE:  Denied.

67.     The Defendants did not disclose to Celtic that they planned to resign from their positions at Celtic or that they planned to work for a competitor.

RESPONSE:  Defendants deny that they "did not disclose to Celtic that they planned to resign." Defendants did give notice of their resignations from Celtic. Defendants admit they did not disclose they intended to work for ReadyCap, but deny they had any obligation to do so.

68.     The Defendants did not disclose to Celtic that they had begun working for Ready Capital and/or ReadyCap while they were still employed at Celtic.

RESPONSE:  Defendants deny they were employed by Ready Capital or ReadyCap while employed by Celtic, and accordingly, admit they did not make such a disclosure.

69.     At least as early as January 11, 2024, the Defendants began to send Celtic's confidential information and Celtic's trade secrets regarding the SBA loan application for Gondal Corporation to outside email addresses, including Ready Capital email addresses (the "Gondal Emails"). A copy of the Gondal Emails is attached hereto as Exhibit "E."

27

RESPONSE:   Defendants admit that in January 2024, they communicated via email regarding Gondal Corporation's SBA loan application using their personal email addresses and email addresses ending in "@readycapital.com." Defendants lack sufficient information to either admit or deny the remaining allegations of this paragraph of the Complaint and therefore deny the same.

70.    The Gondal Emails were sent to the Ready Capital email address belonging to Ms. Johnson (McKenzie.Johnson@readycapital.com), as well as the personal email addresses for Mr. Gaetano (rgaetano6975@gmail.com) and Ms. Domingo (ksierra.domingo@gmail.com), among other third-party recipients.

RESPONSE:   Admitted.

71.    Mr. Gaetano is currently employed by Ready Capital as its Director/Managing Business Development Officer. On Mr. Gaetano's public LinkedIn page, Mr. Gaetano states that he has been employed in this position at Ready Capital since February 2024. A screenshot of Mr. Gaetano's LinkedIn account, accessed on February 27, 2024, is attached hereto as Exhibit "F." A screenshot of Mr. Gaetano's bio on Ready Capital's website is attached hereto as Exhibit "G."

RESPONSE:   Gaetano admits he was employed by ReadyCap on February 27, 2024 and that his LinkenIn page reflects as much. Gaetano admits that Exhibit G appears to be a screenshot of his bio on Ready Capital's website, but Gaetano denies that the bio currently exists on Ready Capital's website.

72.    Ms. Domingo is currently employed by Ready Capital as its SBA Senior Production Analyst. On Ms. Domingo's public LinkedIn page, Ms. Domingo states that she has been employed in this position at Ready Capital since February 2024. A screenshot of Ms. Domingo's LinkedIn account, accessed on February 27, 2024, is attached hereto as Exhibit "H."

RESPONSE:  Domingo admits she was employed by ReadyCap on February 27, 2024 and that her LinkenIn page reflects as much.

73.     Ms. Johnson is currently employed by Ready Capital on its Business Development team.

RESPONSE:  Denied.

**F.     The Defendants' Coordinated Efforts to Conceal Incriminating Evidence and Continue the Unlawful Business Operations.**

74.     The Defendants conspired to steal Celtic's confidential information and trade secrets for the benefit of themselves and Ready Capital and/or ReadyCap. Defendants performed this work on Celtic's computers and network, and in Celtic's offices. The Defendants subsequently sought to conceal their wrongful conduct from Celtic's owners.

RESPONSE: Denied.

75.     In furtherance of their conspiracy, Defendants diverted at least one loan that was originally submitted to Celtic to Ready Capital using Celtic's computers and network in Celtic's offices while actively employed with Celtic.

RESPONSE:  Denied.

76.     For example, the Gondal Emails show that in January 2024, Defendants wrongfully diverted the loan application filed by Gondal Corporation with Celtic to Ready Capital.

RESPONSE:  Denied.

77.     Upon information and belief, Defendants wrongfully diverted numerous other loans from Celtic to Ready Capital in the course of their employment at Celtic, including loans for Le Setai Realty, Mansion Estates, Inc., and an unnamed entity identified as Liquor Store Real Estate Purchase, AL.

RESPONSE:  Denied.

78.     As a result of these coordinated efforts, the Defendants defrauded Celtic by diverting business opportunities to Ready Capital that rightfully belonged to Celtic.

RESPONSE:  Denied.

79.     In addition, on or around February 5, 2024, Ms. Domingo and Ms. Johnson wrongfully downloaded over 3,200 files from Celtic's secure storage drives (the "Stolen Files") using laptops provided by Celtic for their legitimate use as Celtic employees.

RESPONSE:  Defendants admit Domingo and Johnson downloaded certain files from Celtic's systems using laptops provided by Celtic. Defendants lack sufficient information to admit or deny they downloaded information on or about February 5, 2024 and therefore deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

80.     Included in the Stolen Files are 776 files that Ms. Domingo downloaded from Celtic's secure storage drives on or around February 5, 2024 (the "Stolen Domingo Files").

RESPONSE:  Domingo admits she downloaded certain files from Celtic's systems. Domingo lacks sufficient information to admit or deny she downloaded information on or about February 5, 2024 and therefore denies the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

81.     The Stolen Domingo Files contain confidential information and trade secrets belonging to Celtic, including (a) documents regarding Celtic's business methods, techniques, processes, and procedures, and (b) Quick Test Spreadsheets, (c) nearly one-hundred (100) training files regarding underwriting skills, (d) templates for closing loans, and (e) bank forms used for documenting loans.

RESPONSE:  Domingo recalls downloading information related to Celtic's business, Quick Test Spreadsheets, training files, and generic templates and blank forms. Defendants lack

sufficient information to either admit or deny the remaining allegations contained in this paragraph of the Complaint and therefore deny the same.

82.     Also included in the Stolen Files are over 2,470 files that Ms. Johnson downloaded from Celtic's secure storage drives on or around February 5, 2024 (the "Stolen Johnson Files").

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations contained in this paragraph of the Complaint and therefore deny the same.

83.     The Stolen Johnson Files contain confidential information and trade secrets belonging to Celtic, including (a) documents regarding Celtic's business methods, techniques, processes, and procedures, and (b) specific client information relating to clients' SBA loans, including clients' tax returns, financial statements, construction plans, and business debt schedules.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations contained in this paragraph of the Complaint and therefore deny the same.

84.     Collectively, the 3,200+ documents included in the Stolen Files are sufficient to enable the creation of an "out of the box" SBA loan division.

RESPONSE:  Denied.

85.     Additionally, some of the documents contained in both the Stolen Domingo Files and the Stolen Johnson Files contain documents that constitute or otherwise contain client and customer PII.

RESPONSE:  This paragraph does not define "PII" or "personal identifiable information," and accordingly, Defendants cannot admit or deny that the documents contained "personal identifiable information." To the extent that a response is required, Defendants admits some of the documents would allow a person to identify the customer associated with the documents.

Defendants lack sufficient information to either admit or deny the remaining allegations contained in this paragraph of the Complaint and therefore deny the same.

86.     Ms. Domingo's and Ms. Johnson's conduct of downloading the Stolen Files was not a legitimate use of Celtic's computers and network, and exceeded any authority Defendants had to access and use files in the normal course of business.

RESPONSE: Denied.

87.     On or around February 5, 2024, Ms. Domingo and Ms. Johnson transferred the Stolen Files to their own personal storage drives, including their personal Google Drive accounts and/or their personal DropBox accounts.

RESPONSE:  Domingo admits that she transferred the information she downloaded to her personal DropBox account. Defendants admit that Johnson uploaded documents to a Dropbox account. Defendants lack sufficient information to admit or deny that they uploaded the documents on February 5, 2024 and therefore deny the same. Defendants do not recall uploading documents to a Google Drive account.

88.     Ms. Domingo's and Ms. Johnson's transfers of the Stolen Files to their personal storage drives was unlawful and in clear violation of Celtic's internal policies.

RESPONSE:  Denied.

89.     On or around February 5, 2024 and February 6, 2024, Ms. Domingo and Ms. Johnson deleted all or substantially all of the files they downloaded from the OneDrive with the intent of concealing evidence that they had misappropriated the Stolen Files to their personal storage drives.

RESPONSE:  Domingo admits she deleted some files she downloaded from OneDrive, but denies she deleted all files she downloaded from Celtic's OneDrive. Defendants lack sufficient

information to either admit or deny the allegation that Johnson deleted the files she downloaded, and therefore deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

90.     Upon information and belief, and due to Mr. Gaetano's position as Ms. Domingo's and Ms. Johnson's direct supervisor and his direct involvement in the Gondal Emails, which included customer information, other confidential information, and trade secrets that belonged to Celtic, Mr. Gaetano knew or should have known of Ms. Domingo's and Ms. Johnson's unlawful conduct related to the Stolen Files and their misappropriation of Celtic's trade secrets.

RESPONSE:  Defendants admit that Gaetano was Domingo's and Johnson's supervisor and that he sent and received some of the emails involving Gondal. Defendants deny the remaining allegations in this paragraph of the Complaint.

## G.     *Defendants' Resignations from Celtic and Celtic's Subsequent Discovery of the Defendants' Scheme.*

90.     Beginning on or around January 16, 2024, Celtic's IT Department was alerted to the Gondal Emails, and became aware that Defendants were using their personal email addresses for work related to Celtic's clients.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

91.     At the request of Tim McGoff ("Mr. McGoff"), Celtic's Chief Business Development Officer and the executive in charge of all Defendants, Celtic's IT Department began looking into the Gondal Emails to determine whether there was any evidence that Ready Capital dodged a finder's fee.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

92.     Several days later, on February 6, 2024, Ms. Johnson announced her resignation from Celtic, effective on the same day.

RESPONSE:  Defendants admit that Johnson gave her notice of resignation from Celtic on or about February 6, 2024.

93.     On the following day, February 7, 2024, Ms. Domingo and Mr. Gaetano announced their resignations from Celtic, effective on the same day.

RESPONSE:   Defendants admit that Gaetano and Domingo gave their notices of resignation from Celtic on or about February 7, 2024.

94.     After learning of the Defendants' resignations, certain of Celtic's executives, including Celtic's Chief Technology Officer, Andrew Yenchik ("Mr. Yenchick"), suspected that the Defendants exfiltrated some of Celtic's confidential information prior to their resignations.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

95.     On February 8, 2024, Yenchik authorized the IT Department to begin an investigation to determine whether the Defendants had exfiltrated any of Celtic's files.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

96.     The investigation uncovered that Ms. Domingo and Ms. Johnson had downloaded the 3,200+ Stolen Files on February 5, 2024 using the laptops provided to them by Celtic.

RESPONSE:   Defendants admit Domingo and Johnson downloaded certain files from Celtic's systems using laptops provided by Celtic. Defendants lack sufficient information to admit or deny they downloaded information on or about February 5, 2024 and therefore deny the same. Defendants deny the remaining allegations in this paragraph of the Complaint.

97.     The investigation also uncovered that both Ms. Domingo and Ms. Johnson accessed non-Celtic Google Drive accounts and non-Celtic DropBox accounts on the same day that they downloaded the Stolen Files.

RESPONSE:   Domingo admits that she accessed her personal DropBox account. Defendants admit that Johnson accessed a Dropbox account. Defendants lack sufficient information to admit or deny that they accessed the Dropbox accounts on the same day they downloaded information and therefore deny the same. Defendants do not recall accessing a Google Drive account.

98.     Moreover, the investigation uncovered that Defendants were actively employed with Ready Capital as early as January 2024, while they were also actively employed with Celtic.

RESPONSE:   Defendants deny they were employed by Ready Capital in January 2024 while employed with Celtic. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

99.     Celtic's IT Department subsequently delivered the Defendants' laptops to Premier Forensics for further investigation.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

100.    On February 15, 2024, Celtic filed a police report with the Salt Lake Police Department, explaining that Defendants had unlawfully stolen Celtic's intellectual property and exfiltrated numerous files containing PII. A copy of the Salt Lake Police Department Dispatch Log is attached hereto as Exhibit "I."

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

101.     Celtic provided the following statement to the police officer:

On Feb. 5, Celtic Bank suffered an event of unlawful computer access by Karen Domingo and McKenzie Johnson that resulted in over 3,200 files containing confidential data and/or financial instruments of a financial institution including identifying information (PII) being exfiltrated from Celtic Bank by means of electronic transfer.

This removal of banking information from bank computers was done without authorization and exceeded any possible authorization that these individuals ever had or would have ever had.

This access - without authorization - resulted in copying and/or transmission of data and technology and bank know-how all of which is considered highly confidential information. To be clear, this transmission included the unlawful disclosure and removal of personally identifying information of bank customers.

Finally, Domingo and Johnson did this in direct contravention of bank policies that were explained to them at their time of hire and for which they signed acknowledgments that they had received and understood their duties of confidentiality relating to Celtic Bank's confidential information and the need to safeguard Celtic Bank records and confidential information.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

**H.     *Defendants' Continued Unlawful Activities Following their Resignations from Celtic.***

100.     Defendants used Celtic's confidential information to secretly, unlawfully, and fraudulently benefit themselves and Ready Capital and/or ReadyCap, while employed by Celtic, and continue to use and copy all of Celtic's information and business models to unlawfully and unfairly compete in the industry.

RESPONSE:  Denied.

101.     Upon information and belief, Defendants have shared Celtic's confidential information and trade secrets with their current employer, Ready Capital.

RESPONSE:  Defendants admit Ready Capital has received access to some information from Celtic. Defendants affirmatively allege that the information has been quarantined and isolated by a third-party forensics firm, Charles River Associates.

102.   On February 16, 2024, Celtic sent a letter to executives and general counsel at Ready Capital demanding that the Defendants return to Celtic all confidential information in their possession, custody, or control.

RESPONSE:  Defendants admit that Celtic sent a letter to Ready Capital on or about February 16, 2024. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

103.   Defendants failed to respond to Celtic's demand to return Celtic's confidential information.

RESPONSE:  Defendants have not received a demand to return Celtic's confidential information, as they did not receive the letter identified in paragraph 102 of the Complaint. Defendants admit that, because they never received a demand from Celtic, they did not respond to it.

104.   Defendants' ongoing use and disclosure of Celtic's trade secrets, whether in tangible, physical form or based on their memories, is unlawful and has caused Celtic to incur incalculable damages.

RESPONSE:  Denied.

105.   The Defendants' conspiracy to use Celtic's offices, resources, confidential and proprietary information, and trade secrets to covertly further the business interests of a direct competitor, and to enrich themselves at Celtic's expense has directly and proximately caused irreparable harm to Celtic, including, but not limited to, loss of business opportunities. Defendants'

continued use and disclosure of Celtic's confidential information and trade secrets will also cause Celtic to lose the benefit of its trade secrets and the legitimate competitive advantage that Celtic has earned through its substantial investments in such trade secrets.

RESPONSE:  Denied.

## FIRST CAUSE OF ACTION
**(Misappropriation of Trade Secrets in Violation of the Defend Trade Secrets Act, 18 U.S.C. § 1836, et seq. - Against All Defendants)**

106.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

107.    Celtic's trade secrets and confidential business information include data, files, and information regarding Celtic's business, operations, technologies, processes, services, the identity of Celtic's clients, growth and marketing strategies, training materials, bank forms and templates, proprietary formulae and spreadsheets, and other highly confidential and proprietary information and/or commercially sensitive information (collectively, the "Trade Secrets").

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

108.    Celtic has derived independent economic value from its Trade Secrets not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information.

RESPONSE:  Defendants deny that all of the information Domingo downloaded is "not being generally known to and not being readily ascertainable through proper means by another person who could obtain economic value from the disclosure or use of the information." At least some, and possibly all, of the information Domingo downloaded is publicly available or readily

available to Gaetano and Domingo. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

109.    Celtic has taken reasonable measures to keep its Trade Secrets secret and confidential by, among other steps, limiting access to such information, requiring employees to attend training on the protection of Celtic's confidential and trade secret information, and requiring employees to abide by confidentiality agreements and observe Celtic's policies on protecting Celtic's proprietary and confidential information.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

110.    Celtic has used its Trade Secrets to transact interstate commerce.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

111.    By virtue of his position as Celtic's Senior Vice President of Business Development, and as he acknowledged in various agreements he signed with Celtic, Mr. Gaetano had extensive access to, and was under a duty to maintain the secrecy of, Celtic's Trade Secrets.

RESPONSE:  Whether Gaetano had a duty to maintain the secrecy of any information is a legal conclusion to which no response is required. Defendants deny the remaining allegations in this paragraph of the Complaint.

112.    By virtue of her position as Celtic's Business Development Associate, and as she acknowledged in various agreements she signed with Celtic, Ms. Domingo had extensive access to, and was under a duty to maintain the secrecy of, Celtic's Trade Secrets.

RESPONSE:  Whether Domingo had a duty to maintain the secrecy of any information is a legal conclusion to which no response is required. Defendants deny the remaining allegations in this paragraph of the Complaint.

113.    By virtue of her position as Celtic's Business Development Associate, and as she acknowledged in various agreements she signed with Celtic, Ms. Johnson had extensive access to, and was under a duty to maintain the secrecy of, Celtic's Trade Secrets.

RESPONSE:  Whether Johnson had a duty to maintain the secrecy of any information is a legal conclusion to which no response is required. Defendants deny the remaining allegations in this paragraph of the Complaint.

114.    Ms. Domingo, Ms. Johnson, and Mr. Gaetano acquired, disclosed, used, and currently possess Celtic's trade secrets, as those terms are defined under 18 U.S.C. § 1839(3).

RESPONSE:   Whether Defendants "acquired, disclosed, used, and currently possess Celtic's trade secrets, as those terms are defined under 18 U.S.C. § 1839(3)" is a legal conclusion to which no response is required.

115.    The confidential and proprietary information and Trade Secrets Ms. Domingo, Ms. Johnson, and Mr. Gaetano took from Celtic have independent economic value because they are not generally known, or readily ascertainable by individuals outside of Celtic.

RESPONSE:   Defendants deny that all of the information Domingo and Johnson downloaded is not generally known, or readily ascertainable by individuals outside of Celtic. At least some of, and possibly all of, the information Domingo and Johnson downloaded is publicly available or readily available to Domingo and Gaetano. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

40

116.    Celtic made and continues to make reasonable efforts to maintain the secrecy of its Trade Secrets.

RESPONSE:  Defendants deny that Celtic maintains the secrecy of all of its information. At least some of, and possibly all of, Celtic's information is publicly available. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

117.    Ms. Domingo, Ms. Johnson, and Mr. Gaetano have and will inevitably continue to disclose the Trade Secret information to Ready Capital and/or ReadyCap if they are permitted to continue to perform duties for Ready Capital and/or ReadyCap.

RESPONSE:  Defendants admit Ready Capital has received access to some information from Celtic. Defendants affirmatively allege that the information Domingo and Johnson downloaded at Celtic has been quarantined and isolated by a third-party forensic firm, Charles River Associates. Defendants deny that they "will inevitably continue to disclose the Trade Secret information to Ready Capital and/or ReadyCap if they are permitted to continue to perform duties for Ready Capital and/or ReadyCap."

118.    Even if Ready Capital suspends or terminates their current employment, Ms. Domingo, Ms. Johnson, and Mr. Gaetano have and will inevitably continue to disclose the Trade Secret information to others if they are permitted to retain confidential and proprietary information and Trade Secrets they took from Celtic.

RESPONSE:  Denied.

119.    Ms. Domingo, Ms. Johnson, and Mr. Gaetano have misappropriated Celtic's information because they have disclosed or used Celtic's Trade Secrets for their own benefit and for the benefit of Ready Capital and/or ReadyCap.

RESPONSE:  Denied.

120.    Ms. Domingo's, Ms. Johnson's, and Mr. Gaetano's previous and ongoing use or disclosure of Celtic's Trade Secrets violates 18 U.S.C. §§ 1831 et seq.

RESPONSE:  Denied.

121.    Ms. Domingo's, Ms. Johnson's, and Mr. Gaetano's prior misappropriation, use, and/or disclosure of Celtic's Trade Secrets raises the inference that they will continue to use and disclose Celtic's Trade Secrets to Celtic's detriment unless they are enjoined from doing so by this Court.

RESPONSE:  Denied.

122.    Ms. Domingo's, Ms. Johnson's, and Mr. Gaetano's misappropriation of Celtic's Trade Secrets and confidential business information is wanton, willful, intentional, outrageous and malicious.

RESPONSE:  Denied.

123.    As a direct and proximate cause of Ms. Domingo's, Ms. Johnson's, and Mr. Gaetano's actual, inevitable, and threatened misappropriation, disclosure, and/or use of Celtic's Trade Secrets, Celtic has suffered and will continue to suffer immediate injury, irreparable harm, and damage that cannot be readily measured or remedied by a monetary award, and will continue to suffer injury, irreparable harm, and damage unless and until the individual Defendants are enjoined from their unlawful conduct.

RESPONSE:  Denied.

124.    Ms. Domingo's, Ms. Johnson's, and Mr. Gaetano's appropriation of Celtic's Trade Secrets and confidential business information will continue indefinitely unless enjoined by this Court.

RESPONSE:  Denied.

125.    WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) an award of compensatory and punitive damages; (ii) an award of special, preliminary, and permanent injunctive relief; (iii) an award of attorney fees and costs; and (iv) all such other relief available under 18 U.S.C.A. § 1836(b)(3) or as this Court deems just and equitable.

RESPONSE:  Defendants deny Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

**SECOND CAUSE OF ACTION**
**(Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C.A. § 1962(c) ("RICO") -**
**Against All Defendants)**

126.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:   Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

127.    Ready Capital and/or ReadyCap is an enterprise that engages in and whose activities affect interstate commerce.

RESPONSE:  Whether Ready Capital or ReadyCap is an "enterprise" is a legal conclusion that requires no response. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

128.    Beginning as early as January 11, 2024 and through the present, Mr. Gaetano, Ms. Domingo, and Ms. Johnson conducted or participated in, directly or indirectly, the affairs and activities of Ready Capital and/or ReadyCap through a pattern of racketeering activity.

RESPONSE:  Denied.

129.    The unlawful purposes for these Defendants' Ready Capital-related racketeering activity include: intentionally defrauding Celtic, a financial institution; stealing Celtic's business,

43

profits, and opportunities; and misappropriating Celtic's confidential and proprietary information and Trade Secrets to unfairly compete with Celtic in the marketplace.

RESPONSE:  Denied.

130.    Pursuant to and in furtherance of these unlawful purposes, these Defendants committed multiple predicate acts of executing and attempting to execute a scheme or artifice to defraud Celtic (a financial institution), and theft/misappropriation of Celtic's Trade Secrets, as alleged more specifically above, which acts constitute a pattern of racketeering pursuant to 18 U.S.C.A. § 1961(5).

RESPONSE:  Denied.

131.    Asa direct and proximate result of Mr. Gaetano's, Ms. Domingo's, and Ms. Johnson's pattern of racketeering activities and violations of 18 U.S.C.A. § 1962(c) in connection with their conduct of or participation in the affairs of Ready Capital and/or ReadyCap, Celtic has suffered damages and will continue to suffer damages.

RESPONSE:  Denied.

132.    Alternatively, to the extent that Mr. Gaetano did not violate 18 U.S.C. § 1962(c) with respect to Ready Capital, Mr. Gaetano conspired with and assisted Ms. Domingo and Ms. Johnson in their violations of 18 U.S.C. § 1962(c) with respect to Ready Capital and/or ReadyCap, and is therefore liable under 18 U.S.C.A. § 1962(d).

RESPONSE:  Denied.

133.    Given the explicit evidence of Defendants' predicate acts occurring while they were still employed by Celtic, the extensiveness of the Defendants' scheme, the Defendants' pattern of fraudulent nondisclosure and concealment, and misappropriation of Celtic's reputation and Trade Secrets to gain business for Ready Capital and/or ReadyCap, there is a real and substantial threat

of continued racketeering activity relating to Ready Capital and/or ReadyCap, and potentially any other financial institution at which the Defendants' seek future employment.

RESPONSE:  Denied.

134.    WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) an award of treble damages; (ii) an award of attorney fees and costs; and (hi) all such other relief available under 18 U.S.C.A. § 1964 or as this Court deems just and equitable.

RESPONSE:   Defendants deny Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

**THIRD CAUSE OF ACTION**
**(Violation of the Computer Abuse and Data Recovery Act ("CADRA"), Utah Code Ann. § 63D-3-102 - Against Defendants Ms. Johnson and Ms. Domingo)**

135.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

136.    The Celtic computer systems to which Defendants gained access constitute computers within the meaning of the Computer Abuse and Data Recovery Act ("CADRA") because they store electronic data.

RESPONSE:   This paragraph of the Complaint states a legal conclusion to which no response is required.

137.    The Celtic computer systems to which Defendants gained access constitute protected computers within the meaning of the CADRA because they are used in connection with the operation of a business and require a technological access barrier for an individual to access the system.

RESPONSE:  This paragraph of the Complaint states a legal conclusion to which no response is required.

138.    Defendants intentionally accessed Celtic's protected computer systems.

RESPONSE:  Admitted.

139.    Defendants' permission to access Celtic's protected computer systems was valid only to the extent that they had a legitimate purpose for accessing such information in the normal course of business.

RESPONSE:  Denied.

140.    Defendants accessed Celtic's protected computer systems without permission or authorization, or alternatively, Defendants' access exceeded their permission or authorization because they accessed the protected computer systems for non-legitimate business purposes to obtain and/or to use data, files, and information from Celtic's protected computers, namely Trade Secrets and other confidential information belonging to Celtic, for their own personal use or use of others.

RESPONSE: Denied.

141.    Defendants intentionally and without permission or authorization accessed Celtic's protected computer systems with intent to cause harm or damage by obtaining and downloading data, files, and information from the protected computers, namely Trade Secrets and other confidential information belonging to Celtic, for Defendants' own profit and use, or the profit and use of others.

RESPONSE:  Denied.

142.    Defendants' intentional, unauthorized access and wrongful conduct has caused Celtic, and will continue to cause Celtic, to suffer damages, including economic damages and

profits by the Defendants from the unauthorized access to the protected computer systems, and losses in an amount to be determined at trial, which are ongoing and unabated at the time of filing this Complaint

RESPONSE:  Denied.

143.    WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants including, not limited to: (i) damages, including compensatory, consequential, and punitive damages; (ii) an award of preliminary and permanent injunctive relief; (iii) interest, costs, and attorney's fees to the extent allowable by law; and (iv) all such other relief allowable under Utah Code Ann. § 63D-3-101 and as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:  Defendants deny that Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

### FOURTH CAUSE OF ACTION
**(Conversion - Against All Defendants)**

144.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

145.    Celtic is entitled to exclusively possess the data, files, and information housed on its computer systems, cloud storage account, and servers, including, but not limited to its data, files, and information regarding Celtic's business, operations, technologies, processes, services, the identity of Celtic's clients, growth and marketing strategies, training materials, bank forms and templates, proprietary formulae and spreadsheets, and PII.

RESPONSE:  Denied.

146.    Defendants intentionally, purposely, and unlawfully exercised dominion or control over Celtic's property that has value, including, but not limited to, data, files, and information on Celtic's computer systems and servers for their own personal use and benefit or the personal use and benefit of others.

RESPONSE:  Denied.

147.    From at least January 11, 2024 through February 5, 2024, Defendants obtained access to and downloaded over 3,000 files containing Celtic applications, needs lists, SBA documents, deal information, process documents, client lists, and personal identifying information that belongs to Celtic.

RESPONSE:  Defendants admit Domingo and Johnson downloaded certain files from Celtic's systems. Defendants lack sufficient information to either admit or deny the remaining allegations in this paragraph of the Complaint and therefore deny the same.

148.    As a result, Celtic has lost exclusive access to the over 3,000 files containing Celtic applications, needs lists, SBA documents, deal information, process documents, client lists, and PII over which it otherwise would have had exclusive dominion and control but for Defendants' wrongful conduct.

RESPONSE:  Denied.

149.    Celtic did not authorize Defendants' dominion or control over its property.

RESPONSE:  Denied.

150.    Defendants continue to exercise dominion and control over Celtic's data, files, and information for their own personal use and benefit or the personal use and benefit of others.

RESPONSE:  Denied.

4887-8790-8020.v2

151.    Defendants' conduct was committed willfully, knowingly, maliciously, and in conscious disregard of their legal obligations to Plaintiff.

RESPONSE:  Denied.

152.    Celtic has been, and continues to be, directly and proximately harmed by Defendants' wrongful conversion in an amount to be proven at trial.

RESPONSE:  Denied.

153.    WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) damages, including compensatory, consequential, incidental and punitive damages, together with filing fees, interest, and costs of suit; (ii) injunctive relief requiring the return of Celtic's wrongfully converted property, and (iii) and all such other relief as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:  Defendants deny that Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

### FIFTH CAUSE OF ACTION
### (Civil Conspiracy - Against All Defendants)

154.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

155.    All Defendants in this action conspired together for the objective of misappropriating Celtic's Trade Secrets and stealing Celtic's business and assets without expending any of their own efforts, money towards overhead, marketing, etc.

RESPONSE:  Denied.

156.    This conspiracy included the raiding and gutting of Celtic's business from the inside, for the Defendants' own personal gain and for the benefit of Ready Capital and/or

ReadyCap, by stealing Celtic's confidential and proprietary information and Trade Secrets, misrepresenting that information and those Trade Secrets as Ready Capital's and/or ReadyCap's, usurping and diverting business opportunities that rightfully belonged to Celtic for the benefit of Ready Capital and/or ReadyCap, and by sabotaging Celtic's position in the market by stealing Celtic's customers for Ready Capital and/or ReadyCap through intentional deception and confusion.

RESPONSE:  Denied.

157.    The Defendants further agreed that the course of action to accomplish that objective would be for Mr. Gaetano, Ms. Domingo, and Ms. Johnson to breach their duties of loyalty by actively working for Ready Capital and/or ReadyCap while on Celtic's payroll, without Celtic's knowledge or consent.

RESPONSE:  Denied.

158.    Additionally, these disloyal Former Employees agreed to coordinate with each other to delete and conceal from Celtic's owners any incriminating evidence of their Ready Capital-related activities using Celtic computers and within Celtic's offices in furtherance of the Defendants' conspiracy.

RESPONSE:  Denied.

159.    The Defendants' actions, in breaching their duty of loyalty, stealing and misappropriating Celtic's Trade Secrets, and intentionally interfering with Celtic's business relations by soliciting Celtic's customers, were unlawful and overt.

RESPONSE:  Denied.

160.    As a direct and proximate result of Defendants' unlawful, overt actions in furtherance of their conspiracy, Celtic has suffered and will continue to suffer immeasurable

damages, including, but not limited to, loss of goodwill, loss of business reputation, and other damages. To the extent monetary damages resulting from the Defendants' conspiracy may be calculated, Celtic will prove them at trial and will seek them against all Defendants.

RESPONSE:  Denied.

144.    WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) damages, including compensatory, consequential, incidental and punitive damages, together with filing fees, interest, and costs of suit; and (ii) such other relief as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:  Defendants deny that Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

## SIXTH CAUSE OF ACTION
### (Fraudulent Non-Disclosure - Against Defendant Mr. Gaetano)

162.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

163.    Mr. Gaetano had a legal duty to report to Celtic any knowledge or good faith belief or suspicion that any Celtic employee has violated or is violating any portion of Celtic's Code of Ethics, including, but not limited to, an employee's conflict of interest, a material transaction or relationship that could give rise to conflict of interest, a violation of law, a violation of Celtic's intellectual property rights, or an instance of dishonest or unethical conduct.

RESPONSE:  This paragraph of the Complaint contains a legal conclusion to which no response is required.

164.    At all relevant times, including at least from January 11, 2024 through his resignation on February 7, 2024, Mr. Gaetano had knowledge that Mr. Gaetano, Ms. Domingo,

51

and/or Ms. Johnson violated Celtic's Code of Ethics by, among other conduct: (a) taking actions in furtherance of Celtic's direct competitor, Ready Capital and/or ReadyCap, at the expense of Celtic, while working in Celtic's offices and using computers provided by Celtic; (b) misappropriating and disclosing Celtic's Trade Secrets; (c) wrongfully diverting Celtic's business opportunities to Ready Capital and/or ReadyCap; and (d) unlawfully exfiltrating documents that constituted and/or contained PII.

RESPONSE:  Denied.

165.    At all relevant times, including at least from January 11, 2024 through his resignation on February 7, 2024, Mr. Gaetano had knowledge that Defendants' wrongful conduct violated Celtic's Code of Ethics and would result in irrevocable harm to Celtic.

RESPONSE:  Denied.

166.    At all relevant times, including at least from January 11, 2024 through his resignation on February 7, 2024, Mr. Gaetano had knowledge that his employment with Celtic was contingent on his compliance with all of Celtic's policies, including its Code of Ethics policy and the mandatory reporting requirements of his Ethics Agreement. Accordingly, Mr. Gaetano knew that the undisclosed information regarding Defendants' wrongful conduct was material to his continued employment with Celtic.

RESPONSE:  Denied.

167.    Mr. Gaetano never reported or otherwise disclosed to Celtic any of Defendants' known violations of Celtic's Code of Ethics or any of their unlawful or improper conduct, despite his known duty to do so, as defined in his Ethics Agreement.

RESPONSE:   Because there were no "known violations" of "unlawful or improper conduct," Gaetano admits he did not make a report of such violations.

168.     Mr. Gaetano's fraudulent nondisclosure has injured and damaged Celtic and has caused and/or will cause irreparable harm to Celtic.

RESPONSE:  Denied.

169.     Mr. Gaetano's omissions were committed under circumstances constituting willful and malicious and/or intentionally fraudulent conduct, and/or conduct which reflects a reckless disregard for the rights of Celtic.

RESPONSE:  Denied.

170.     Accordingly, Celtic is entitled to an award of punitive damages in an amount to be determined at trial.

RESPONSE:  Denied.

145.     WHEREFORE, Celtic is entitled to entry of judgment against Defendant Mr. Gaetano as requested herein for monetary relief in an amount to be proved at trial, including punitive damages, plus pre- and post-judgment interest and all such other relief as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:   Defendants deny Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

**SEVENTH CAUSE OF ACTION**
**(Fraudulent Non-Disclosure, Fraudulent Concealment -**
**Against Defendants Ms. Johnson and Ms. Domingo)**

171.     Ms. Domingo and Ms. Johnson had a legal duty to report to Celtic any knowledge or good faith belief or suspicion that any Celtic employee has violated any portion of Celtic's Code of Ethics, including but not limited to an employee's conflict of interest, a material transaction or relationship that could give rise to conflict of interest, a violation of law, a violation of Celtic's intellectual property rights, or an instance of dishonest or unethical conduct.

RESPONSE:  This paragraph of the Complaint contains a legal conclusion to which no response is required.

172.    At all relevant times, including at least from January 11, 2024 through his resignation on February 7, 2024, Ms. Domingo and Ms. Johnson had knowledge that all Defendants violated Celtic's Code of Ethics by, among other conduct: (a) taking actions in furtherance of Celtic's competitor, Ready Capital and/or ReadyCap, at the expense of Celtic, while working in Celtic's offices and using computers provided by Celtic; (b) misappropriating and disclosing Celtic's Trade Secrets; (c) wrongfully diverting Celtic's business opportunities to Ready Capital and/or ReadyCap; and (d) unlawfully exfiltrating documents that constituted and/or contained PII.

RESPONSE:  Denied.

173.    On February 5, 2024, Ms. Domingo and Ms. Johnson intentionally prevented Celtic from acquiring material information regarding Defendants' wrongful conduct, including by deleting the Stolen Files from their Celtic computers with the purpose of concealing evidence that they had misappropriated Celtic's Trade Secrets.

RESPONSE:  Denied.

174.    At all relevant times, including at least from January 11, 2024 through his resignation on February 7, 2024, Ms. Domingo and Ms. Johnson had knowledge that Defendants' wrongful conduct would result in irrevocable harm to Celtic.

RESPONSE:  Denied.

175.    At all relevant times, including at least from January 11, 2024 through his resignation on February 7, 2024, Ms. Domingo and Ms. Johnson had knowledge that their employment with Celtic was contingent on their compliance with all of Celtic's policies, including

54

its Code of Ethics policy and the mandatory reporting requirements of their Ethics Agreement. Accordingly, Ms. Domingo and Ms. Johnson knew that the undisclosed information regarding Defendants' wrongful conduct was material to their continued employment with Celtic.

RESPONSE:  Denied.

176.    Ms. Domingo never reported or otherwise disclosed to Celtic any of Defendants' known violations of Celtic's Code of Ethics or any of their unlawful or improper conduct, despite her known duty to do so, as defined in her Ethics Agreement.

RESPONSE:   Because there were no "known violations" of "unlawful or improper conduct," Domingo admits she did not make a report of such violations.

177.    Ms. Johnson never reported or otherwise disclosed to Celtic any of Defendants' known violations of Celtic's Code of Ethics or any of their unlawful or improper conduct, despite her known duty to do so, as defined in her Ethics Agreement.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

178.    Ms. Domingo's and Ms. Johnson's fraudulent nondisclosure and fraudulent concealment has injured and damaged Celtic and has caused and/or will cause irreparable harm to Celtic.

RESPONSE:  Denied.

179.    Ms. Domingo's and Ms. Johnson's omissions were committed under circumstances constituting willful and malicious and/or intentionally fraudulent conduct, and/or conduct which reflects a reckless disregard for the rights of Celtic.

RESPONSE:  Denied.

180.     Accordingly, Celtic is entitled to an award of punitive damages in an amount to be determined at trial.

RESPONSE:  Denied.

181.     WHEREFORE, Celtic is entitled to entry of judgment against Defendants Ms. Domingo and Ms. Johnson as requested herein (a) for injunctive relief, and/or (b) for monetary relief in an amount to be proved at trial, including punitive damages, plus pre- and post-judgment interest, and all such other relief as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:   Defendants deny Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

**EIGHTH CAUSE OF ACTION**
**(Breach of Contract, Security Agreement - Against All Defendants)**

180.     Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:   Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

181.     The Security Agreements are binding contractual agreements between Plaintiff and Defendants.

RESPONSE:  Denied.

182.     Mr. Gaetano executed the Security Agreement on May 22, 2014, Ms. Domingo executed the Security Agreement on November 24, 2014, and Ms. Johnson executed the Security Agreement on August 19, 2021.

RESPONSE:   Gaetano admits he signed the Information Security Confidentiality and Security Procedures Agreement on May 22, 2014. Domingo admits she signed the Information Security Confidentiality and Security Procedures Agreement on November 24, 2014. Defendants

lack sufficient information to either admit or deny the remaining allegations in this paragraph and therefore deny the same.

183.    Mr. Gaetano acted in contravention of the Security Agreement when he accessed, downloaded, and misappropriated Celtic's confidential information without authorization, and disclosed information relating to Celtic and its customers to unauthorized third parties, while still employed by Celtic.

RESPONSE:  Denied.

184.    Ms. Domingo acted in contravention of the Security Agreement when she accessed, downloaded, and misappropriated Celtic's confidential information without authorization, and disclosed information relating to Celtic and its customers to unauthorized third parties, while still employed by Celtic.

RESPONSE:  Denied.

185.    Ms. Johnson acted in contravention of the Security Agreement when she accessed, downloaded, and misappropriated Celtic's confidential information without authorization, and disclosed information relating to Celtic and its customers to unauthorized third parties, while still employed by Celtic.

RESPONSE:  Denied.

186.    Celtic has substantially complied with its obligations, including, but not limited to, the continued employment and compensation of Mr. Gaetano, Ms. Domingo, and Ms. Johnson.

RESPONSE:  Denied.

187.    The Security Agreement is valid, enforceable, and supported by adequate consideration.

RESPONSE:  Denied.

188.    Mr. Gaetano materially breached the Security Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

189.    Ms. Domingo materially breached the Security Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

190.    Ms. Johnson materially breached the Security Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

191.    Celtic has been damaged by Mr. Gaetano's, Ms. Domingo's, and Ms. Johnson's breaches as described above.

RESPONSE:  Denied.

192.    WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) damages, including compensatory and consequential; (ii) specific performance and injunctive relief; and (iii) and all such other relief as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:  Defendants deny Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

## NINTH CAUSE OF ACTION
### (Breach of Contract, Ethics Agreement - Against All Defendants)

193.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

4887-8790-8020.v2

194.    The Ethics Agreements are binding contractual agreements between Plaintiff and Defendants.

RESPONSE:  Denied.

195.    Mr. Gaetano most recently executed an Ethics Agreement on December 29, 2023, Ms. Domingo most recently executed an Ethics Agreement on December 30, 2023, and Ms. Johnson most recently executed an Ethics Agreement on November 29, 2023.

RESPONSE:  Gaetano admits that he received a certification "for successfully completing the course Celtic Bank Code of Ethics" on December 29, 2023. Domingo admits that she received a certification "for successfully completing the course Celtic Bank Code of Ethics" on December 30, 2023. Defendants lack sufficient information to admit or deny that Johnson "executed an Ethics Agreement on November 29, 2023," and therefore deny the same. Defendants deny they have an ethics agreement, or any agreement, with Celtic.

196.    Mr. Gaetano acted in contravention of the Ethics Agreement when he, among other actions: (a) engaged in activities that compete with Celtic or compromise Celtic's interests while using Celtic's offices and equipment; (b) diverted corporate opportunities rightfully belonging to Celtic for his own benefit and/or the benefit of others, (c) violated banking laws and regulations by disclosing PII to unauthorized third parties, and (d) failed to report Defendants' violations of the Code of Ethics.

RESPONSE:  Denied.

197.    Ms. Domingo acted in contravention of the Ethics Agreement when she, among other actions: (a) engaged in activities that compete with Celtic or compromise Celtic's interests while using Celtic's offices and equipment; (b) diverted corporate opportunities rightfully belonging to Celtic for her own benefit and/or the benefit of others, (c) violated banking laws and

regulations by disclosing PII to unauthorized third parties, and (d) failed to report Defendants' violations of the Code of Ethics.

RESPONSE:  Denied.

198.    Ms. Johnson acted in contravention of the Ethics Agreement when she, among other actions: (a) engaged in activities that compete with Celtic or compromise Celtic's interests while using Celtic's offices and equipment; (b) diverted corporate opportunities rightfully belonging to Celtic for her own benefit and/or the benefit of others, (c) violated banking laws and regulations by disclosing PII to unauthorized third parties, and (d) failed to report Defendants' violations of the Code of Ethics.

RESPONSE:  Denied.

199.    Moreover, as Ms. Domingo's and Ms. Johnson's direct supervisor who at all relevant times had knowledge of and approved of or directed Ms. Domingo's and Ms. Johnson's wrongful conduct, Mr. Gaetano is liable for their violations of the Ethics Agreement.

RESPONSE:  Denied.

200.    Celtic has substantially complied with its obligations, including, but not limited to, the continued employment and compensation of Mr. Gaetano, Ms. Domingo, and Ms. Johnson.

RESPONSE:  Denied.

201.    The Ethics Agreement is valid, enforceable, and supported by adequate consideration.

RESPONSE:  Denied.

202.    Mr. Gaetano materially breached the Ethics Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

203.     Ms. Domingo materially breached the Ethics Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

204.     Ms. Johnson materially breached the Ethics Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

205.     Celtic has been damaged by Mr. Gaetano's, Ms. Domingo's, and Ms. Johnson's breaches as described above.

RESPONSE:  Denied.

206.     WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) damages, including compensatory and consequential; (ii) specific performance and injunctive relief; and (iii) and all such other relief as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:  Defendants deny Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

**TENTH CAUSE OF ACTION**
**(Breach of Contract, Privacy Agreement -**
**Against Defendants Mr. Gaetano and Ms. Domingo)**

207.     Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:  Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

208.     The Privacy Agreements are binding contractual agreements between Plaintiff and Mr. Gaetano and Ms. Domingo.

RESPONSE:  Denied.

209.    Mr. Gaetano executed the Privacy Agreement on May 22, 2014, and Ms. Domingo executed the Privacy Agreement on November 24, 2014.

RESPONSE:  Gaetano admits he signed the Acknowledgement of Reading Privacy Policy on May 22, 2014. Domingo admits she signed the Acknowledgement of Reading Privacy Policy on November 24, 2014.

210.    Mr. Gaetano acted in contravention of the Privacy Agreement when he, among other actions, unlawfully disclosed customer information, including PII, to unauthorized third parties without a specific business purpose.

RESPONSE:  Denied.

211.    Ms. Domingo acted in contravention of the Privacy Agreement when she, among other actions, unlawfully disclosed customer information, including PII, to unauthorized third parties without a specific business purpose.

RESPONSE:  Denied.

212.    Celtic has substantially complied with its obligations, including, but not limited to, the continued employment and compensation of Mr. Gaetano and Ms. Domingo,

RESPONSE:  Denied.

213.    The Privacy Agreement is valid, enforceable, and supported by adequate consideration.

RESPONSE:  Denied.

214.    Mr. Gaetano materially breached the Privacy Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

215.     Ms. Domingo materially breached the Privacy Agreement by engaging in the

conduct set forth in this Complaint.

RESPONSE:  Denied.

216.     Celtic has been damaged by Mr. Gaetano's and Ms. Domingo's breaches as

described above.

RESPONSE:  Denied.

217.     WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment

in its favor and against Defendants for: (i) damages, including compensatory and consequential;

(ii) specific performance and injunctive relief; and (iii) and all such other relief as this Court deems

just and equitable and/or as may be allowable by law.

RESPONSE:   Defendants deny Celtic is entitled to any of the relief identified in this

paragraph of the Complaint.

### ELEVENTH CAUSE OF ACTION
#### (Breach of Contract, Confidential Information Agreement - Against Defendant Ms. Johnson)

218.     Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:   Defendants adopt and incorporate their responses to the foregoing

paragraphs of the Complaint as if fully set forth herein.

219.     The Confidential Information Agreement is a binding contractual agreement

between Plaintiff and Ms. Johnson.

RESPONSE:  Denied.

220.     Ms. Johnson executed the Confidential Information Agreement on August 19,

2021.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations

in this paragraph of the Complaint and therefore deny the same.

221.    Ms. Johnson acted in contravention of the Privacy Agreement when she, among other actions, unlawfully disclosed customer information, including PII, to unauthorized third parties without a specific business purpose.

RESPONSE:  Denied.

222.    Celtic has substantially complied with its obligations, including, but not limited to, the continued employment and compensation of Ms. Johnson.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

223.    The Confidential Information Agreement is valid, enforceable, and supported by adequate consideration.

RESPONSE:  Denied.

224.    Ms. Johnson materially breached the Confidential Information Agreement by engaging in the conduct set forth in this Complaint.

RESPONSE:  Denied.

225.    Celtic has been damaged by Ms. Johnson's breaches as described above.

RESPONSE:  Denied.

226.    WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) damages, including compensatory and consequential; (ii) specific performance and injunctive relief; and (iii) and all such other relief as this Court deems just and equitable and/or as may be allowable by law.

RESPONSE:   Defendants deny Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

## TWELFTH CAUSE OF ACTION
### (Breach of Good Faith and Fair Dealing - Against All Defendants)

227.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

228.    The Security Agreement and Ethics Agreement entered into by all Defendants and Celtic contained an implied covenant of good faith and fair dealing under which Defendants covenanted that they would deal with Celtic in good faith and take no actions that would deprive Celtic of the rightful benefits of its bargain.

RESPONSE:  Denied.

229.    The Privacy Agreement entered into by Mr. Gaetano and Ms. Domingo with Celtic contained an implied covenant of good faith and fair dealing under which Mr. Gaetano and Ms. Domingo covenanted that they would deal with Celtic in good faith and take no actions that would deprive Celtic of the rightful benefits of its bargain.

RESPONSE:  Denied.

230.    The Confidential Information Agreement entered into between Ms. Johnson and Celtic contained an implied covenant of good faith and fair dealing under which Ms. Johnson covenanted that they would deal with Celtic in good faith and take no actions that would deprive Celtic of the rightful benefits of its bargain.

RESPONSE:  Denied.

231.    Plaintiff complied with all requirements under the Security Agreements, Ethics Agreements, Privacy Agreements, and Confidential Information Agreement (the "Contracts").

RESPONSE:  Denied.

232.     Upon information and belief, Defendants acted in bad faith at the time that they entered into the Contracts and thereafter by conspiring to wrongfully compete with Celtic while still employed by Celtic, converting Celtic's Trade Secrets, and misappropriating Celtic's Trade Secrets to third parties in violation of one or more Contracts.

RESPONSE:  Denied.

233.     Upon information and belief, Defendants knowingly deceived Celtic by suggesting that their intentions were to maintain an employment relationship with Celtic at a time when Defendants were engaged in wrongful and/or unlawful conduct in violation of one or more Contracts.

RESPONSE:  Denied.

234.     Plaintiff would not have continued to employ Defendants had Plaintiff learned of Defendants' violations of the Contracts during the course of their employment.

RESPONSE:  Defendants lack sufficient information to either admit or deny the allegations in this paragraph of the Complaint and therefore deny the same.

235.     Defendants' conduct, as alleged herein, is causing, and unless enjoined by this Court, will continue to cause Celtic irreparable damage and injury.

RESPONSE:  Denied.

236.     WHEREFORE, Plaintiff respectfully requests this Honorable Court enter judgment in its favor and against Defendants for: (i) damages, including compensatory and consequential; (ii) specific performance and injunctive relief; and (iii) such other relief as this Court may deem just and proper.

RESPONSE:  Defendants deny that Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

## THIRTEENTH CAUSE OF ACTION
**(Breach of Fiduciary Duty of Loyalty - Against All Defendants)**

237.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:    Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

238.    Mr. Gaetano, Ms. Domingo, and Ms. Johnson owed Celtic a duty to maintain the confidentiality of Celtic's confidential and proprietary information and Trade Secrets.

RESPONSE:  This paragraph of the Complaint contains a legal conclusion to which no response is required.

239.    Mr. Gaetano, Ms. Domingo, and Ms. Johnson owed a duty to act in Celtic's best interests and to not compete with or divert business opportunities from Celtic to its competitors while still employed by Celtic.

RESPONSE:  This paragraph of the Complaint contains a legal conclusion to which no response is required.

240.    Celtic entrusted Mr. Gaetano, Ms. Domingo, and Ms. Johnson with extensive access to Celtic's confidential and proprietary information and Trade Secrets so that they could conduct business and manage financial resources and customer affairs on Celtic's behalf.

RESPONSE:  Defendants admit they received access to Celtic's information so that they could, among other things, "conduct business and manage financial resources and customer affairs on Celtic's behalf." Defendants deny the remaining allegations in this paragraph of the Complaint.

241.    Mr. Gaetano, Ms. Domingo, and Ms. Johnson solicited Celtic customers for and on behalf of Celtic's direct competitor, Ready Capital and/or ReadyCap, while they were employed by Celtic, without Celtic's knowledge or consent.

RESPONSE:  Denied.

4887-8790-8020.v2

242.    As current and former employees of Celtic, Mr. Gaetano, Ms. Domingo, and Ms. Johnson owed a duty of loyalty to Celtic.

<u>RESPONSE</u>:  This paragraph of the Complaint contains a legal conclusion to which no response is required.

243.    Mr. Gaetano, Ms. Domingo, and Ms. Johnson breached their duty of loyalty to Celtic by (a) disclosing Celtic's confidential and proprietary information and Trade Secrets, (b) soliciting Celtic's customers for another company, (c) downloading and misappropriating that information before resigning, (d) using that information to induce customers away from Celtic and to Ready Capital and/or ReadyCap, and (e) actively managing Ready Capital's and/or ReadyCap's competing business, and concealing and deleting evidence of such activities from Celtic.

<u>RESPONSE</u>:  Denied.

244.    Celtic has been irreparably damaged by Mr. Gaetano's, Ms. Domingo's, and Ms. Johnson's disloyal actions.

<u>RESPONSE</u>:  Denied.

245.    WHEREFORE, Celtic is entitled to: (i) injunctive relief in the form of a temporary restraining order, preliminary injunction, and permanent injunctive relief; (ii) compensatory damages, (iii) restitution of the value of the benefits improperly obtained by Defendants, (iv) disgorgement of the compensation paid to Defendants during the period of their disloyalty; and (v) and all such other relief as this Court deems just and equitable and/or as may be allowable by law.

<u>RESPONSE</u>:  Defendants deny that Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

### <u>FOURTEENTH CAUSE OF ACTION</u>
### (Injunctive Relief - Against All Defendants)

246.    Celtic adopts and fully incorporates the preceding allegations as if set forth herein.

RESPONSE:   Defendants adopt and incorporate their responses to the foregoing paragraphs of the Complaint as if fully set forth herein.

247.    Defendants, through their acts and omissions set forth herein, have caused, and continue to cause, irreparable harm to Celtic. The harm includes, but is not limited to, loss of the benefit of its Trade Secrets, loss of the legitimate competitive advantage that Celtic has earned through its substantial investments in such Trade Secrets, loss of corporate goodwill, loss of customers and clients, loss of credibility and increased difficulty in securing contracts with clients, and loss of business opportunities, among other kinds of irreparable harm.

RESPONSE:  Denied.

248.    There is a substantial likelihood that Celtic will prevail on the merits of its underlying claims.

RESPONSE:  Denied.

249.    Celtic will suffer irreparable harm if the injunction does not issue.

RESPONSE:  Denied.

250.    The harm and injuries that Celtic has suffered and continues to suffer due to Defendants' wrongful conduct outweighs whatever harm Defendants may suffer if Defendants are temporarily and permanently enjoined.

RESPONSE:  Denied.

251.    An injunction to prevent further wrongful conduct by Defendants, if issued, would not be adverse to the public interest.

RESPONSE:  Denied.

252.    WHEREFORE, Celtic is entitled to a temporary restraining order, preliminary injunction and permanent injunction that prevents Defendants, along with their respective agents,

employees, attorneys, and those persons in active concert or participation with them: (1) from further breaches and violations of their Contracts with Celtic; (2) from possessing, disclosing or using Celtic's information, including, but not limited to, any and all of Celtic's confidential and proprietary information and its Trade Secrets. Unless such activities are halted at once, Celtic will suffer irreparable harm. Celtic is also entitled to an award of its costs and expenses, including reasonable attorneys' fees.

<u>RESPONSE</u>:  Defendants deny that Celtic is entitled to any of the relief identified in this paragraph of the Complaint.

## **PRAYER FOR RELIEF**

Defendants deny that Celtic is entitled to any of the relief it requests in this action, either as prayed for in the Complaint or otherwise.

## **AFFIRMATIVE DEFENSES**

Defendants assert the following affirmative defenses:

## **FIRST AFFIRMATIVE DEFENSE**

Celtic fails to state a claim upon which relief may be granted.

## **SECOND AFFIRMATIVE DEFENSE**

Celtic's claims are preempted by the Utah Uniform Trade Secrets Act, Utah Code § 13-24-8.

## **THIRD AFFIRMATIVE DEFENSE**

Celtic's claims are barred by the economic loss rule.

## **FOURTH AFFIRMATIVE DEFENSE**

Celic's claims fail because of a lack of consideration and failure of consideration.

4887-8790-8020.v2

## FIFTH AFFIRMATIVE DEFENSE

Celtic's claims fail because it breached the alleged contracts between the parties before Defendants' ostensible breaches.

## SIXTH AFFIRMATIVE DEFENSE

Celtic's claims fail because Defendants owe no duties to Celtic.

## SEVENTH AFFIRMATIVE DEFENSE

Celtic's claims fail because it has failed to mitigate its damages.

## EIGHTH AFFIRMATIVE DEFENSE

Celtic's claims fail because of insufficient service of process.

## NINTH AFFIRMATIVE DEFENSE

Celtic's claims fail because it has failed to join a party under Federal Rule of Civil Procedure 19.

## TENTH AFFIRMATIVE DEFENSE

Defendants are entitled to an offset on Celtic's claims.

## ELEVENTH AFFIRMATIVE DEFENSE

Celtic's claims fail because any damages or harm it has suffered was caused by its own conduct.

## DEMAND FOR JURY TRIAL

Defendants hereby respectfully demand trial by jury as to all issues and/or claims in this action which are so triable.

## COUNTERCLAIM

Defendants respectfully Submit their Counterclaim against Celtic Bank Corporation ("Celtic").

4887-8790-8020.v2

## PARTIES

1.      Richard Gaetano is an individual who resides in Palm Beach Gardens, Florida.

2.      Karen Domingo is an individual who resides in Salt Lake City, Utah.

3.      Celtic is a bank with its principal place of business in Salt Lake City, Utah.

## JURISDICTION AND VENUE

4.      The Court has supplemental jurisdiction over Gaetano's and Domingo's claims pursuant to 28 U.S.C. § 1367.

5.      The Court has personal jurisdiction over Celtic because its principal place of business is in Utah and because it transacts business in this state. Utah Code § 78B-3-205(1).

6.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because the events or omissions giving rise to Gaetano's and Domingo's claims occurred in this judicial district, or alternatively, because Celtic is subject to personal jurisdiction in this Court.

## FACTUAL ALLEGATIONS

7.      Celtic is a bank that holds itself out as a "top ten SBA lender."

8.      Celtic has been successful in helping several small businesses acquire loans guaranteed by the U.S. Small Business Administration ("SBA loans").

9.      Much of Celtic's success is attributable to Gaetano and Domingo, who both served on Celtic's business development team for several years.

10.     From June 2014 to February 2024, Gaetano was one of Celtic's most successful Senior Vice Presidents of Business Development.

11.     In his position at Celtic, Gaetano was primarily responsible for building relationships with consumers who were interested in taking out an SBA loan.

12.      Domingo was part of Gaetano's team at Celtic. She worked at Celtic from November 2014 to February 2024.

13.      Gaetano and Domingo were extremely successful in helping consumers apply for SBA loans with Celtic; in the years they worked for Celtic, Gaetano and Domingo were responsible for directing many millions of dollars' worth of loans to Celtic.

14.      Gaetano and Domingo both received salaries at Celtic. In addition to their salaries, part of Gaetano's and Domingo's compensation came from commission payments Celtic paid Gaetano and Domingo.

15.      The commission payments were calculated based on a percentage of the total value of each loan Gaetano and Domingo directed to Celtic.

16.      There are several loans (the "Loans") Gaetano and Domingo successfully directed to Celtic while they were employed by Celtic, but that Celtic has not paid Gaetano and Domingo commissions on.

17.      For example, Gaetano and Domingo directed a customer called Empower Realty to Celtic to receive a loan.

18.      Upon information and belief, Gaetano is owed approximately $50,400.00 in commissions on the loan associated with Empower Realty.

19.      Upon information and belief, Domingo is owed approximately $3,600.00 in commissions on the loan associated with Empower Realty.

20.      Gaetano and Domingo also directed a customer called Texas Cubes to Celtic to receive a loan.

21.      Upon information and belief, Gaetano is owed approximately $16,000.00 in commissions on the loan associated with Texas Cubes.

4887-8790-8020.v2

22.     Upon information and belief, Domingo is owed approximately $1,600.00 in commissions on the loan associated with Texas Cubes.

23.     Gaetano and Domingo also directed a customer called Dublin Gas Station to Celtic to receive a loan.

24.     Upon information and belief, Gaetano is owed approximately $9,750.00 in commissions on the loan associated with Dublin Gas Station.

25.     Upon information and belief, Domingo is owed approximately $1,625.00 in commissions on the loan associated with Dublin Gas Station.

26.     Gaetano and Domingo also directed a customer called Innovate Adult Daycare to Celtic to receive a loan.

27.     Upon information and belief, Gaetano is owed approximately $12,600.00 in commissions on the loan associated with Innovate Adult Daycare.

28.     Upon information and belief, Domingo is owed approximately $900.00 in commissions on the loan associated with Innovate Adult Daycare.

29.     Upon information and belief, in total, for the Loans identified above, Gaetano is owed $88,750.00.

30.     Upon information and belief, in total, for the Loans identified above, Domingo is owed $7,725.00.

31.     Directing the Loans to Celtic required Gaetano and Domingo to use considerable time, skill, and effort.

32.     Additionally, the Loans conferred a significant financial benefit on Celtic, which retained a sizeable percentage of the Loans for itself as payment.

33.    Gaetano and Domingo resigned from their positions with Celtic on or about February 7, 2024.

34.    After they resigned from their positions with Celtic, Domingo had a phone call with Kalie Blackman. Blackman is a human resources representative at Celtic.

35.    On her call with Blackman, Domingo asked whether she would be paid the commissions associated with the Loans.

36.    Blackman responded via email to Domingo's question. In her email, she affirmed that Tim McGoff, who was Gaetano's supervisor at Celtic, approved payment of the commissions owed to Gaetano and Domingo based on the Loans. Specifically, Blackman stated: "In regard to your loans being paid if they go through after the 15th, from Tim (McGoff): 'yes. All will be under review and based on potential effort of others who may need to be involved.'"

37.    On February 9, 2024, Gaetano had a phone call with McGoff in which McGoff again confirmed that Celtic would pay the commissions based on the Loans.

38.    Despite Blackman's and McGoff's statements, to date, Celtic has not paid Gaetano or Domingo the commission payments owed to them for the Loans.

**FIRST CAUSE OF ACTION**
**Unjust Enrichment**

39.    Gaetano and Domingo incorporate by reference each of the allegations stated in the Counterclaim as if fully restated herein.

40.    By using their time, skill, and effort to direct the Loans to Celtic, Gaetano and Domingo conferred a significant financial benefit upon Celtic. Celtic retained a sizeable percentage of the Loans Gaetano and Domingo directed to it as payment for itself.

41.    Celtic appreciated and knew of the financial benefit conferred upon it by Gaetano and Domingo. Indeed, Celtic employed Gaetano and Domingo because it knew Gaetano and

Domingo would confer significant financial benefits upon it, including the financial benefits it gained from the Loans.

42.     Celtic has retained the financial benefit of the Loans under circumstances that would make it inequitable not to pay Gaetano and Domingo the commissions they are owed.

43.     Specifically, Celtic has not paid Gaetano and Domingo the commissions associated with the Loans, even though Blackman and McGoff, who are both agents and employees of Celtic, affirmatively stated Celtic would pay the commissions.

44.     Accordingly, Gaetano and Domingo are entitled to recover the commission payments based on the Loans.

## PRAYER FOR RELIEF

WHEREFORE, Defendants/Counterclaim Plaintiffs pray as follows:

1.     Celtic's claims against Defendants be dismissed with prejudice;

2.     An order granting Gaetano an award of damages in an amount to be proved at trial, but for no less than $88,750.00;

3.     An order granting Domingo an award of damages in an amount to be proved at trial, but for no less than $7,725.00; and

4.     Any further relief that this Court deems just and proper.

DATED this 5th day of April, 2024.

PARSONS BEHLE & LATIMER


*/s/ Benjamin D. Perkins*
Timothy B. Smith (USB #8271)
Benjamin D. Perkins (USB #18503)

*Attorneys for Richard Gaetano and Karen Domingo*

76

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on the 5th day of April, 2024, I caused a true and correct copy of the foregoing **ANSWER AND COUNTERCLAIM OF RICHARD GAETANO AND KAREN DOMINGO** to be filed using the Court's e-filing service, which sent electronic notification of the filing to all counsel of record.

*/s/ Benjamin D. Perkins*
Benjamin D. Perkins

4887-8790-8020.v2